Filed 8/25/20  P. v. Morales CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>IVAN MORALES,<br><br>        Defendant and Appellant. | A154263<br><br>(Sonoma County<br>Super. Ct. No. SCR-682933) |

A jury found defendant Ivan Morales guilty of attempted premeditated murder (Pen. Code, §§ 664, 187), second-degree robbery (*id.*, § 211), assault on a police officer (*id.*, § 241, subd. (c)), assault with an assault weapon (*id.*, § 245, subd. (a)(3)), and driving or taking a vehicle without consent (Veh. Code, § 10851, subd. (a)) and found true various enhancements including personal discharge of a firearm causing great bodily injury (Pen. Code, § 12022.53, subd. (d)) in the commission of the attempted murder and robbery.  The trial court sentenced Morales to a total aggregate term of 38 years to life in state prison.

On appeal, Morales raises three evidentiary issues.  He contends (1) the trial court improperly limited defense expert testimony on false confessions, (2) evidence of a prior uncharged robbery was improperly admitted, and (3) evidence of an out-of-court statement by his codefendant was improperly admitted as a statement against penal interest.  Finding no error, we affirm.

1

## FACTUAL AND PROCEDURAL BACKGROUND

On July 12, 2016, Loomis Armored Car employees Chris and Glenn were working as partners on a route that took them through the Santa Rosa area.[1] Chris was the driver, and Glenn was the messenger. Around 1:50 p.m., they arrived at a customer location, a Chase Bank branch in a shopping center in Windsor. Chris parked in front of the bank, and Glenn got out of the truck.

Glenn grabbed a bag containing $30,000 in paper currency and closed the side door of the truck. As he turned, he saw a person wearing a ski mask standing at the back of the Loomis truck pointing an assault rifle at him. The robber said, "Drop it." Glenn turned to "get out of the line of fire," and the next thing he knew, he was on the ground. He had been shot in at least three places: in the right forearm, left upper arm, and right leg.

Chris, who remained in the truck, heard gunfire and looked out the passenger window. He saw a shooter with what looked like an AK-47 or long rifle. The shooter wore a sky-blue bandanna and a matching blue hoodie. Chris saw the shooter pick up the bag of money and go to a getaway car.[2]

Glenn lost 20 percent of his blood volume and suffered a life-threatening injury to his leg as well as a complex fracture of his left upper arm.

That afternoon, Calistoga Police Officer Luis Paniagua was on duty in his patrol car when he heard a broadcast report about a blue Suburban that had been involved in a nearby robbery. Minutes after the broadcast,

---

[1] At trial, Chris and Glenn testified using their first names only.

[2] Although Chris and Glenn only saw one robber, witnesses at the shopping center described a vehicle pulling up behind the Loomis truck and two robbers exiting the vehicle.

Paniagua observed a blue Suburban driving down the road. The driver appeared to be a white man in his 20's with a shaven head, and the front seat passenger appeared to be a Hispanic man with a ponytail. At trial, Paniagua identified codefendant Sergey Gutsu as the driver and Morales as the passenger.

Paniagua followed the Suburban in his patrol car until the Suburban failed to yield the right-of-way at a stop sign, at which point Paniagua prepared to initiate a traffic stop. Paniagua was attempting to send a radio dispatch when Gutsu emerged from the driver's side of the Suburban with a semi-automatic pistol, assumed a shooter's stance, and began firing at Paniagua's patrol car. Paniagua "immediately reacted" to the sound of the shots by "flooring" his vehicle and "ramm[ing]" Gutsu at approximately 25 miles per hour, hitting Gutsu and the Suburban. The patrol car eventually came to a stop at a tree. Paniagua sustained multiple injuries and may have momentarily lost consciousness as a result of the impact.

As he got out of his patrol car, Paniagua spotted the passenger of the Suburban (Morales) running away from the scene, apparently unarmed.

Meanwhile, Gutsu was attempting to return to the Suburban. He appeared to be injured and was limping. Paniagua told him to get on the ground, and he complied. Paniagua then handcuffed Gutsu and placed him in the back of his patrol car. At that point, Paniagua activated his body camera.[3]

---

[3] At trial, Paniagua testified that he had "forgotten" to turn on his body-worn camera prior to putting Gutsu in the patrol car. He confirmed that the whole experience had been "very exciting, stressful, [and] adrenaline-filled" and had happened "so quickly" he had not thought to activate his camera.

Paniagua was primarily concerned with locating and disarming any firearms; he asked Gutsu if his passenger was armed, and whether there were other firearms besides the semi-automatic pistol Gutsu had used (and which Paniagua later located under the rear tire of the Suburban). Gutsu responded, "He had an A-K, but it's in the back," which Paniagua understood to mean that Gutsu's companion (Morales) had an assault weapon, but it was now in the back of the Suburban. Paniagua searched the Suburban and found an AK-47, a tactical vest with magazines, and several bags.[4] Upon inspecting the assault rifle, Paniagua found it to be jammed and therefore inoperable.

A Sonoma County Sheriff's deputy located and arrested Morales around 6:45 p.m. that day.

Detective Joseph Horsman and another detective questioned Morales multiple times over the course of days. The interviews were recorded and played for the jury. The first interview began around 9:45 p.m. on the day of the robbery. There was a break at 10:36 p.m., more questioning at 11:00 p.m., and a break at 11:32 p.m. Morales was given water and a Clif bar at 10:50 p.m. He was questioned again around 2:23 a.m. He was booked into jail around 5:05 a.m. Horsman questioned Morales again on July 14, at around 10:35 a.m. At that time, Horsman told Morales that there was surveillance video of the robbery. Horsman testified this was not true; it was "a ruse we'll sometimes use during interviews."

---

[4] Gutsu was the registered owner of the semi-automatic pistol found under the Suburban. Morale's wife was the registered owner of the AK-47 semi-automatic rifle found inside the Suburban.

Morales never denied that he and Gutsu robbed the Loomis truck. Initially, however, he said Gutsu forced him to participate in the robbery.[5] Morales told the detectives that Gutsu showed up at his house and said he had "this job down in . . . Windsor." Morales reported that he told Gutsu he didn't want to do it, but Gutsu "pulls out his gun and he points it at me, and he, and then he stands me up and he pushes me against the wall and says I know your wife has a rifle in the house. I want it. So he walks me to my bedroom, he lays me down on the bed, and he says okay, where is it. And he had the . . . gun to my head." Morales said Gutsu grabbed his wife's rifle and told Morales he was going to be the getaway driver. He said Gutsu shot the guard, and he (Morales) grabbed the bag of money.

Later, Horsman told Morales that Gutsu had been talking to law enforcement about what happened at the robbery. Morales then admitted he wasn't held at gunpoint and wasn't forced to drive in the robbery after all. Morales said he was the driver during the robbery, and he used a pistol. He said he did not shoot the guard.

In subsequent questioning, Horsman told Morales he had reviewed videos and he knew Morales shot the rifle. Morales responded, "there's no point in lying now" and admitted that he shot the victim. He said Gutsu also fired shots and grabbed the bag of money. He also reported that Gutsu had been talking about the planned robbery for a few weeks.[6]

---

[5] Morales told the detectives he had known Gutsu for two or three years, and they met through mutual friends. In fact, Morales's mother testified at trial that Morales and Gutsu had been friends since junior high. Morales was 23 years old at the time of the interview.

[6] Morales's cell phone internet browser history showed a search for "Loomis armored vehicle schematic" on July 3, 2016, a search for "Armored car robberies in Windsor, California," on June 28, 2016, and other searches

Morales and Gutsu were tried simultaneously by separate juries.[7]

## DISCUSSION

A.   *Limitation on Defense Expert's Testimony*

Morales contends the trial court erred by not allowing his expert in the field of the psychology of confession and interrogation, Deborah Davis, to identify specific interrogation techniques used during his questioning that could have resulted in an unreliable confession. Morales further argues the court's evidentiary ruling denied him his federal constitutional rights to present a defense and to due process of law.

1.   Procedural Background

Morales filed a motion in limine seeking to present Davis as an expert regarding false confessions. The motion stated that Morales sought "to present expert opinion in the manner accepted in *Page* and *Hall*."

In *People v. Page* (1991) 2 Cal.App.4th 161, defendant Page confessed to killing his girlfriend after several hours of police questioning; he recanted

---

regarding armored vehicles, ammunition, and AK-47's made in June and July 2016. On July 3, Morales texted to Gutsu, "I found a schematic."

Morales's phone's text history showed extensive text exchanges with Gutsu's phone that refer to Morales's AK-47, violence, and ammunition. In April 2016, Morales texted Gutsu about an upcoming gun show in Reno. Morales texted, " 'Shit, I just could have had,' 'I could have had Gloria [Morales's wife] cop a rifle. Just need her to pass the fire safety test.' " Within a few minutes, he texted Gutsu, "I want my AK." In May, Morales texted to Gutsu, "My AK is all gangster out." Gutsu responded, "Let ya boy pull up and murder and skirt." In June, Morales texted to Gutsu that he had "four banana magazines" and each "banana" held 30 rounds. During the same text conversation, Morales asked Gutsu, "We still doing the Humboldt gig?" After Gutsu responded, "IDK," Morales texted back, "But now the AK is upset. It does not get to taste blood."

[7] Gutsu pleaded no contest to all charges and admitted all enhancement allegations before his case went to his jury.

6

almost immediately, "claiming it was the product of police coercion and his own guilt and confusion." (*Id*. at pp. 163–164.) At trial, Page intended to call a social psychologist as "a defense expert on persuasion and conformity" and proposed three general categories of expert testimony on false confessions. (*Id*. at p. 180.) The first category was "the general psychological factors which might lead to an unreliable confession, along with descriptions of the supporting experiments." (*Id*. at p. 183.) The second category involved identifying particular elements in the taped police interrogation "which indicated that those psychological factors were present" in Page's case; the third category was the expert's opinion on the reliability of Page's confession, "given the overall method of interrogation." (*Ibid*.) The trial court restricted the defense expert to testifying on the first category only. (*Ibid*.) On appeal, Page claimed (1) the Evidence Code required the trial court to admit the second and third categories of proposed expert testimony, and (2) the restrictions on the expert's testimony violated his right to present a complete defense. Division Three of our court rejected both claims. (*Id*. at pp. 184, 187.)

In *United States v. Hall* (C.D. Ill. 1997) 974 F.Supp. 1198 (*Hall*), a federal district court ruled that a proposed defense witness qualified under the federal rules of evidence as an expert in the field of coercive interrogation techniques which may lead to false confessions. (*Id*. at p. 1205.) The defense expert was permitted to testify "that false confessions do exist, that they are associated with the use of certain police interrogation techniques, and that certain of those techniques were used in [the defendant] Hall's interrogation in this case." (*Ibid*.) The witness was not allowed to "testify about matters of causation, specifically, whether the interrogation methods used in this case caused Hall to falsely confess." (*Ibid*.) Thus, in *Hall*, the defendant was

7

permitted to present evidence on the first and second categories identified in *Page*, but not the third category.

In this case, at a pre-trial hearing on evidentiary issues, the trial court asked defense counsel if she intended to have Davis review the videotaped interviews of Morales and identify instances of the detectives employing particular interrogation techniques that may lead false confessions (category two testimony in *Page*). Defense counsel responded, "I do not see that as the central part of her testimony." Defense counsel went on to explain that she understood *Page* to permit both category one and category two testimony, but in her own experience, courts differed on whether they would allow category two testimony. Defense counsel opined that permitting the defense expert to testify on category two was "more effective" than limiting the expert to category one, and she stated, "If this court permits it, it would certainly be my intention to ask [Davis], 'Having reviewed the recordings, where in the recordings do you see the interrogation methods utilized?' "

The trial court stated its tentative decision was to allow Davis to testify. The prosecutor objected to allowing category two testimony and also asked for a "written ruling regarding the scope and the parameters" of Davis's testimony. The prosecutor then mentioned that he would be entitled to discovery including any report Davis might be ordered to prepare based on her review of the videotaped interviews. The court asked defense counsel what her position was on further discovery.

Defense counsel responded that defense had completed discovery on category one testimony by producing Davis's report. As to discovery for category two testimony, counsel stated that Davis had not yet been asked to prepare for such questions, but if the court were to rule that category two testimony could be presented, she would ask Davis to prepare for category

8

two testimony and the defense would then produce the required discovery material as soon as possible.

Defense counsel summarized, "At this point, my position is that all the discovery has been provided in category one; category three . . . I'm not going to . . . present any opinions about that; and the middle one, category two, is, I would defer to the Court, and will be guided by what the Court determines."

The trial court stated that its "tentative thought" was to allow testimony on category one, "but not to move into category two." Defense counsel urged the court to decide whether to permit category two testimony based "on the due process and right to present defense arguments . . ., and not based on any sort of objections at this point relating to discovery." The court responded that its evidentiary ruling would be based on "detailed case law in the area: *Page*, and *Linton*,[8] and other cases," not discovery considerations.

The next day, the trial court stated it had sent out a two-page tentative ruling regarding the defense expert. Although the written tentative ruling is not part of the clerk's transcript, the court stated its ruling on the record during a later discussion in anticipation of Davis's testimony: "I went back to my ruling regarding Dr. Davis's testimony, and . . . I'm going to just quote

---

[8] In *People v. Linton* (2013) 56 Cal.4th 1146 (*Linton*), cited by the prosecution, our Supreme Court held the lower court acted within its discretion in excluding the defendant's proffered expert on false and coerced confessions altogether where there was a "dearth of evidence indicating a false admission or confession" and "a multitude of corroborative evidence . . . that suggested defendant's admissions and confession were true." (*Id.* at p. 1182.) The court concluded under the circumstances of the case, "it fell within the trial court's broad discretion to determine that [the defense expert]'s proffered testimony had, at most, minimal probative value, which was substantially outweighed by its likely undue consumption of time." (*Ibid.*)

some of the language as we had talked about and the Court stated in its ruling.  [¶] I'm going to follow the parameters of People versus Page in this area.  And I had stated that Dr. Davis . . . would be allowed to discuss the general factors which may influence a person to give a false confession, she will be allowed to give general examples of those factors, and a general discussion of relevant studies and experiments.  [¶] I then go on to talk about what she won't be permitted to testify to."

      2.     <u>Davis's Testimony</u>

At trial, Davis testified at length on interrogation techniques and the psychology of false confessions.  (Her testimony lasted two hours and spanned 64 pages of reporter's transcript.)  She began by explaining that false confessions are known to occur based on documented wrongful convictions where the accused falsely confessed, laboratory studies showing that students will falsely confess when accused of cheating, and surveys of the police.

Davis testified there are three main reasons a person may give a false confession.  First, a "distress-induced" confession may occur when a person "get[s] really stressed out in the interrogation room.  Because interrogations can be incredibly long."  Especially when people are very tired or ill or emotionally distressed, "it becomes more difficult for them to tolerate being there for very long.  So many people confess just to get away; and they're thinking, 'We'll straighten this out later.' "  Younger people are likely to confess falsely for this reason.  They "don't have as much impulse control; they don't have the maturity and the experience to know what's going to happen if they confess."  Second, people may falsely confess because they believe doing so is in their self-interest.  Davis explained that some interrogation techniques "are designed to convince you that you are going to be better off legally if you confess than if you don't confess."  Third, many

10

people confess because they are afraid of authority. For an innocent person to resist confessing, he or she "ha[s] to sit there and defy authority [f]or hours or days or indefinitely. And many people . . . just, can't do that." This may be because they "are just conflict-avoidant, or they've learned from their history of life that, when they defy powerful others, they're hurt. And some people just can't maintain that defiance."

Davis explained that a set of strategies known as the Reid technique developed in the 1930's when police moved from "just overt torture and into the era of psychological interrogation." Currently, law enforcement in the United States generally are trained in the Reid technique, although it has been documented to lead to false confessions.

Davis testified that a fundamental principle of persuasion is to set up circumstances that will undermine resistance, and one way to do that is to make the suspect uncomfortable. Interrogation manuals discuss anxiety and discomfort as ways to "fuel the need to get away" and to make the suspect not think clearly. There are recommendations such as making the chair and temperature uncomfortable "to make the person feel a sense of isolation," putting the interrogator "between the suspect and the doors, so there's a sense of not being able to escape," and not giving the suspect enough to drink or eat. Davis agreed that handcuffing a suspect for a long period of time would certainly cause discomfort.[9]

Davis testified that a long, stressful, uncomfortable interrogation can lead a person to confess falsely for two reasons. First, the more distressed a person becomes, the more willing the person is to do whatever he thinks will

_____

[9] Defense counsel elicited testimony from Horsman that Morales was in handcuffs during questioning and that he was in an interview room from 8:15 p.m. to 5:00 a.m. the next morning with no bed.

11

get him out of there, which means saying what the police want to hear. Second, physical and emotional distress undermine cognitive capacities. "[P]eople become much more distractable and can't focus and then can't remember things," and so they "become more suggestible and persuadable simply because they can't think of what's wrong with what they're being told."

Davis testified that the overall goal of the interrogator is to create several illusions. The main illusion is that the interrogator has authority to affect what is going to happen to the suspect based on what the suspect says. Interrogators are trained to act sympathetic "because one of the most basic principles of influence is that, if somebody likes you, they're much more likely to agree with you or do what you're asking them to do." Interrogators use "time-limited offer[s]," as are used in sales. So an interrogator might say, " 'I'm going to help you right now; but if you don't tell me the truth, I'm gone, and your opportunity to tell your side of the story is also gone.' " Davis explained that "truth" in this context means what the interrogator wants the suspect to say.

Davis testified that in a technique referred to as "confident accusation" or "positive confrontation," the interrogator—after establishing rapport with the suspect—makes an accusation and refers to supposed evidence. The interrogator says something like, " 'We know you did it, and here's something about how, and we're not here to find out whether you did it. We're here to find out why you did it and what kind of person you are.' " According to Davis, this technique "is designed to cut off all hope." Davis testified that "one of the best predictors of false confession is when the interrogators lie about evidence that they don't really have." She agreed that a "false claim[]

12

of . . . a videotape . . ." is an example of such false evidence likely to cause a false confession.

Once the interrogator has "established hopelessness," the next step is "to sell the idea of confession." Davis testified there are two general strategies for this. "One is to make it seem like confession is going to be without any particular consequences, and even to your benefit; and the other one is to raise the perceived cost of denial." For example, "if there's a co-perpetrator, [the interrogator says,] 'That other guy is telling us his story, and he's telling us that you're the one that started it' " and " 'if you don't tell us [and] . . . try to pretend like you didn't do anything, we're just going to have to believe that story. This is your opportunity to tell your story and put your side on the table.' " To raise "the perceived costs of denial," an interrogator may say something like, " 'How do you think it's going to look to someone else, the judge, the jury, et cetera, if you just lie, and you don't take responsibility.' "

Defense counsel asked about the significance of interrogation that occurs in repeated sessions over many hours or several days. Davis responded, first, "there's a lot of research on sleep deprivation that says that it reduces your impulse control, and it certainly impairs your thinking."[10] Second, there is "carryover effect," meaning "things that happen in one [interrogation session] are not forgotten, and they have an effect on how you interpret and react to the things that come in the next one."

In response to a specific question from defense counsel, Davis agreed that stressful events right before the interrogation, such as having been in an accident, threatened, or the victim of a crime would elevate the risk of a

---

[10] Morales could be seen in the videotaped interviews putting his head down on the table and leaning his head against the wall.

13

person making a false confession. Adverse childhood experiences, such as experiencing or witnessing abuse, living with mentally ill or addicted parents, or losing a parent, might also make a person more susceptible to giving a false confession.[11] Davis testified there is evidence that childhood trauma "actually changes the brain in ways that impair self-regulation for the long run." Intellectual deficits also influence suggestibility and tendency to comply with authority.[12]

Finally, Davis testified about assessing whether a confession is true or false. She explained that false confessions are very difficult to recognize. When false confessors go to trial, they are convicted over 80 percent of the

_____

[11] For the defense case, Morales called his mother as a witness. She testified about his difficult childhood. Morales's biological father was violent with Morales when he was very young and with his mother. Morales was five years old when he last saw his biological father. Morales's mother left his father and remarried when Morales was eight years old. According to his mother, Morales's stepfather called Morales names, yelled at him, and said things indicating that Morales did not belong in the family. When Morales was 14 or 15 years old, "a fight in the house" resulted in Morales going to the hospital with bruises on his face and body and the stepfather spending two days in jail. Defense counsel asked Morales's mother, "Were you presented a choice after that incident about your husband and your son [i.e., Morales] returning home?" She responded, yes, "It was presented that either [Morales] would come home or my husband." She chose her husband over Morales, explaining that she "was pregnant with . . . our first child being married," and she "chose to, for [Morales] to stay at . . . my relatives' . . . home." (This presentation of a "choice" to Morales's mother was not further explained in the testimony.)

[12] Morales's mother testified that he received special education services in middle school and high school. The prosecution elicited in cross-examination, however, that Morales graduated from high school and attended community college for a couple of years. Morales's mother agreed with the prosecution's characterization that it "sounds like he was a good student and did well."

14

time, and in laboratory studies, people correctly identify false confessions about half the time. Davis testified it was crucial to look at the origin of each fact in the sequence of the interrogation—"who mentioned this particular fact or this particular idea first? Was it the suspect or the policeman? Also, is it something that could be readily guessed?" She concluded, "[I]f you start to see a pattern where the suspect is just obviously adopting what the interrogator says and it's clearly not even true, then it kind of suggests that [they have] become very compliant, and they're just going along, no matter what."

3.      Preservation of the Issue for Appeal

As a preliminary matter, the Attorney General argues Morales has forfeited his challenge to the trial court's evidentiary ruling. He asserts Morales did not actually seek admission of category two testimony but rather deferred to the trial court on whether such testimony would be allowed.

To preserve an appellate challenge to the exclusion of proffered evidence, the proponent must "ma[k]e known to the court" "[t]he substance, purpose, and relevance of the excluded evidence." (Evid. Code,[13] § 354; *People v. Ramos* (1997) 15 Cal.4th 1133, 1178.) Here, the defense's motion sought admission of expert evidence as accepted in *Hall*, a case in which category two testimony was permitted (974 F.Supp. at p. 1205). At the hearing on the motion, defense counsel argued *Page* permitted category two testimony, asserted it was more effective to present category two testimony, and stated it was her intention to ask category two questions of Davis if allowed to do so by the court. This sufficiently made known to the trial court that Morales

---

[13] Further undesignated statutory references are to the Evidence Code.

wanted to present category two testimony as relevant to the reliability of his confession.

The Attorney General relies on defense counsel's statements that she would "defer" to the court's evidentiary ruling and that the court's ruling would "guide" what the defense would provide to the prosecution in discovery. But these statements, made during a discussion of discovery that would be required *if* the court permitted category two testimony, cannot fairly be understood as negating or waiving Morales's request to present category two testimony. Accordingly, we reject the Attorney General's claim of forfeiture and address Morales's contention on the merits.

4.　　Analysis

" 'Expert opinion testimony is admissible only if it is "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." ' [Citation.] 'When expert opinion is offered, much must be left to the trial court's discretion.' [Citation.] The trial court has broad discretion in deciding whether to admit or exclude expert testimony [citation], and its decision as to whether expert testimony meets the standard for admissibility is subject to review for abuse of discretion." (*People v. McDowell* (2012) 54 Cal.4th 395, 425–426.)

In *Page*, the court held the trial court acted within its discretion in excluding category two testimony. First, the court explained that no legal authority *required* the admission of category two evidence. "Here, the trial court followed [the California Supreme Court's] lead and limited [defense expert] Professor Aronson's testimony to a discussion of 'certain factors that may affect [the reliability of a confession] in a typical case.' (*People v. McDonald* [(1984)] 37 Cal.3d [351,] 370 [, overruled on another point by

16

*People v. Mendoza* (2000) 23 Cal.4th 896, 914].) . . . [N]othing in *McDonald*[14] or the Evidence Code required the court to permit Professor Aronson to discuss the particular evidence in this case or to give his opinion regarding the overall reliability of the confession." (*Page, supra,* 2 Cal.App.4th at p. 188.)

Second, the *Page* court reasoned that when category one evidence is permitted and fully presented (as occurred in *Page* and in this case), category two testimony is not needed. Once the jurors have been educated on the general principles, " 'the factual issues in the case become ones that the jurors can answer as easily as the expert.' In other words, an expert's thorough description of the general principles to be applied in a given case may make additional (and more specific) expert testimony superfluous. [Citations.] In such a case, ' "[t]here is no necessity for [additional expert] evidence, and to receive it would tend to suggest that the judge and jury may shift responsibility for decision to the witness[ ]." ' " (*Page, supra,* 2 Cal.App.4th at pp. 188–189.)

The *Page* court continued, "[I]n the present case, Professor Aronson outlined the factors which might influence a person to give a false statement or confession during an interrogation. Having been educated concerning those factors, the jurors were as qualified as the professor to determine if those factors played a role in Page's confession, and whether, given those

---

[14] In *People v. McDonald,* the California Supreme Court considered expert testimony on psychological factors that may affect the accuracy of eyewitness identifications. (37 Cal.3d at p. 355.) The court concluded that, "although jurors may not be totally unaware of the foregoing psychological factors bearing on eyewitness identification, the body of information now available on these matters is 'sufficiently beyond common experience' that in appropriate cases expert opinion thereon could at least 'assist the trier of fact' (Evid.Code, § 801, subd. (a))." (*Id.* at p. 369.)

17

factors, his confession was false. [¶] In sum, we conclude the trial court did not abuse its discretion when it limited Professor Aronson's testimony" to category one. (*Page*, *supra*, 2 Cal.App.4th at pp. 188–189.)

Morales argues the conclusion drawn in *Page* is faulty, but he offers no authority that has rejected *Page* and we have found none. Our high court recently discussed *Page* and followed its reasoning in *People v. Sanchez* (2019) 7 Cal.5th 14. The *Sanchez* court described *Page* as follows: "The Court of Appeal held that the trial court acted properly in not additionally permitting the expert 'to discuss the particular evidence in this case or to give his opinion regarding the overall reliability of the confession.' ([*Page, supra,* 2 Cal.App.4th] at p. 188.) It was for the jury, not an expert, to determine the reliability of the actual confession. (*Id.* at pp. 187–189.)" (*Sanchez*, at p. 46 [holding the trial court properly permitted an expert on the reliability of child witnesses "to testify about factors the jury should consider in judging [the child witness]'s credibility and the reliability of his statements . . ., and then leaving it to the jury to apply that testimony to the actual facts"].)

We find *Page* persuasive and follow its analysis. Accordingly, we conclude the trial court did not abuse its discretion in limiting Davis to testifying generally about false confessions (category one evidence). Davis testified extensively about various interrogation techniques, how those techniques might lead a person to falsely confess, and some common characteristics of subjects who have been found to be most susceptible to giving false confessions under interrogation.[15] Once Davis educated the

---

[15] In closing argument, defense counsel tied Davis's testimony to the other evidence in the case by identifying the interrogation methods used with Morales: "[F]alse evidence, the cutting off of denials, the technique of the sympathetic detective with the time-limited offer," "a prolonged interrogation, nine hours continuously, sixteen hours total. He's handcuffed

jurors on these general principles, " 'the factual issues in the case bec[a]me ones that the jurors c[ould] answer as easily as the expert.' " (*Page, supra,* 2 Cal.App.4th at p. 188.) Thus, additional expert testimony identifying the techniques used in this case was not necessary, " ' "and to receive it would tend to suggest that the judge and jury may shift responsibility for decision to the witness[ ]." ' " (*Id.* at p. 189.)

Morales also claims the limitation on Davis's testimony "implicat[ed] his federal and state constitutional rights." *Page* rejected a similar argument. Where the defense was allowed "to thoroughly explore the physical and psychological environment in which the confession was obtained" and the defense expert was allowed "to testify as to the psychological factors which could lead to a false confession," the *Page* court concluded the defendant "was not 'stripped of the power to describe to the jury the circumstances that prompted his confession,' " and "the trial court's ruling did not deprive Page of ' "a meaningful opportunity to present a complete defense." ' " (*Page, supra,* 2 Cal.App.4th at pp. 185–186, quoting

_____

the whole time . . . . [Morales is] [c]learly very sleep-deprived, you can see in his manner on the recording as time goes on." And defense counsel argued Morales's background made him particularly vulnerable to those interrogation methods. "Davis talked about people who have been subjected to abuse may have become more compliant due to situations that they've been in before, may have less skills and ability to tolerate the stress of these kind[s] of interrogation methods. And you heard from [Morales]'s mother that he witnessed abuse . . .; that he himself suffered both physical and verbal abuse; and you've heard that he received some special education services. [Davis] talked about, cognitive or intellectual deficits might lessen a person's ability to understand and respond to these interrogation methods as they're going on." Defense counsel urged the jury to consider all these factors when evaluating the video interviews and particularly "the last phase of the interrogation, when [Morales] does give in" (i.e., when he finally said he shot the guard).

19

and distinguishing *Crane v. Kentucky* (1986) 476 U.S. 683, 689–690 (*Crane*).[16])

In *Linton*, *supra*, 56 Cal.4th at page 1183, the trial court did not allow the defense's proffered expert on false confessions to testify at all, but our high court found no violation of the defendant's right to present a defense. The jury in *Linton* was played recordings of the defendant's interviews and heard testimony from the interrogating detective and from two psychologists, including one who addressed the "defendant's particular personality traits that may have lowered his ability to withstand the pressures of interrogation and increased his suggestibility." (*Ibid*.) Our Supreme Court held the exclusion of the proffered expert testimony on false confessions "did not result in the blanket exclusion of evidence concerning the circumstances of defendant's admissions and confession." (*Ibid*.)

Likewise, here, there was no blanket exclusion of evidence on the circumstances of the questioning and admissions. Morales claims he "did not have the opportunity to fully explain the circumstances of his confession, as

---

[16] In *Crane*, *supra*, 476 U.S. 683, the 16-year-old defendant confessed, and at trial, he sought to introduce "testimony about the physical and psychological environment in which the confession was obtained" to show his "statement was unworthy of belief." (*Id*. at p. 684.) The trial court ruled such evidence (including the length of the interrogation and the manner in which it was conducted), was inadmissible. (*Id*. at pp. 685–686.) The United States Supreme Court reversed, recognizing, "the physical and psychological environment that yielded the confession can . . . be of substantial relevance to the ultimate factual issue of the defendant's guilt or innocence. Confessions, even those that have been found to be voluntary, are not conclusive of guilt." (*Id*. at p. 689.) The court concluded, "on the facts of this case that the *blanket exclusion* of the proffered testimony about the circumstances of petitioner's confession deprived him of a fair trial." (*Id*. at p. 690, italics added.) In *Page*, the court found no similar "blanket exclusion" of evidence on the circumstances of the confession. (*Page*, *supra*, 2 Cal.App.4th at p. 186.)

20

well as provide the jury expert assistance in the phenomena of false confessions." This claim is unpersuasive. The jury viewed the videotaped confession and his attorney cross-examined the interrogating detective. On this record, we cannot say Morales was limited in explaining the circumstances of his confession, and the jury received extensive "assistance" on the phenomena of false confessions through Davis's testimony.

Following *Page* and *Linton*, we reject Morales's constitutional claim.

B.   *Admission of Other Acts Evidence*

1.   <u>Background</u>

During police questioning, Morales confessed to driving the getaway car for Gutsu in a robbery of an armored vehicle in Granada Hills (Granada Hills robbery) that had occurred less than four months earlier. Morales told the detectives he believed at the time of the Granada Hills robbery that Gutsu was planning to rob a CVS, not an armored vehicle, and that he, Morales, received no cut of the stolen money.

The prosecution moved to admit evidence of the Granada Hills robbery under Evidence Code section 1101, subdivision (b), arguing it was relevant to prove intent, common scheme or plan, and identity. At trial, Morales argued the evidence should not be admitted under section 1101, and furthermore should be excluded as more prejudicial than probative under section 352. The trial court agreed with the prosecution, finding evidence of the Granada Hills robbery could have a "direct bearing" on the issues identified by the prosecution.

At trial, the jury learned the details of the Granada Hills robbery through the testimony of the victim, Jose Lopez, a messenger and driver for Brinks. Lopez testified that on March 29, 2016, he was robbed by a tall, light-skinned man while he was making a cash delivery to a CVS located in

21

the Granada Hills Shopping Center. The robber pointed a gun at Lopez's head and shouted at him to drop the money bag and put down his gun. (Lopez was armed with a .40 caliber Smith and Wesson firearm.) Lopez complied. The robber then took the bag of money and Lopez's gun and fled on foot with almost $40,000 in cash.

 2. Analysis

Morales challenges the admission of evidence of the Granada Hills robbery as improper under Evidence Code section 352.

Section 1101, subdivision (a), "prohibits the admission of character evidence if offered to prove conduct in conformity with that character trait, sometimes described as a propensity to act in a certain way." (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 405–406.) Subdivision (b) of the statute elaborates on this restriction, however, explaining that evidence of an uncharged offense may be admitted so long as it is "relevant to prove some fact other than propensity." (*Id.* at p. 406.) " ' "The admissibility of other crimes evidence depends on (1) the materiality of the facts sought to be proved, (2) the tendency of the uncharged crimes to prove those facts, and (3) the existence of any rule or policy requiring exclusion of the evidence." ' " (*People v. Jefferson* (2015) 238 Cal.App.4th 494, 504.)

We review the trial court's decision to admit the evidence of the Granada Hills robbery under sections 1101 and 352 for abuse of discretion. (*People v. Leon* (2015) 61 Cal.4th 569, 599 (*Leon*).)

We have no difficulty concluding evidence of the Granada Hills robbery was relevant to intent and common plan or scheme.

First, Morales argued at trial that he acted under duress, claiming Gutsu made threats upon his life if he did not drive the getaway car in the Windsor robbery. Morales's defense thus made intent a material issue for the

jury.  That is because "duress negates an element of the crime charged—the intent or capacity to commit the crime."[17]  (*People v. Heath* (1989) 207 Cal.App.3d 892, 900.)  Evidence that Morales voluntarily acted as the getaway driver in the Granada Hills robbery for the same man who allegedly later threatened him in the Windsor robbery is relevant to assessing Morales's claim of duress in the Windsor robbery.

Second, there was sufficient similarity between the two robberies to permit evidence of the Granada Hills robbery to show common plan or scheme.  In both circumstances, the robbery target was an armored vehicle transporting thousands of dollars in cash to a commercial shopping center, the robbery was committed with the same man, Gutsu, and Morales played the same role of getaway driver.  These common characteristics are sufficient to justify admitting the evidence of the Granada Hills robbery under section 1101, subdivision (b).  (See *Leon*, *supra*, 61 Cal.4th at p. 598 [prior uncharged robberies could be admitted to show "common design or plan" because of the similarities to the charged offense, including store type, location, and time of occurrence].)

Indeed, Morales does not dispute that the Granada Hills robbery evidence was relevant.  He argues on appeal only that the evidence should have been excluded because it was more prejudicial than probative under section 352.  He claims the Granada Hills robbery was of little probative value in establishing intent.  We disagree.  Given Morales's defense theory of duress, evidence that Morales willingly committed a similarly orchestrated robbery with the same man he claims threatened him in the charged offense was highly relevant to the prosecution's effort to defeat his duress defense.

---

[17] The jury was instructed on duress.  (CALCRIM No. 3402.)

That the Granada Hills robbery occurred only a few months before the charged offenses made the evidence even more probative. (See *People v. Johnson* (2010) 185 Cal.App.4th 520, 534 ["more recent misconduct" has more probative value than remote misconduct].) Considering the risk of undue prejudice, the Granada Hills robbery was a less serious offense than the Windsor robbery (during which the armored truck driver was shot several times and nearly killed) and therefore less likely to prejudice the jury against Morales. (See *People v. Rocha* (2013) 221 Cal.App.4th 1385, 1397 [allowing evidence of a prior offense where nobody was injured because it was "hardly the stuff of which inflamed sentiments are made"].) In addition, the jury was properly given a limiting instruction as to how and for what purposes it could consider the Granada Hills evidence. (CALCRIM No. 375, Evidence of Uncharged Offense to Prove Identity, Intent, Common Plan, etc.) Under these circumstances, the trial court did not abuse its discretion in finding that the potential prejudice of the evidence of the Granada Hills robbery did not substantially outweigh its probative value.

Finally, Morales asserts that the admission of the Granada Hills robbery evidence violated his constitutional rights to a fair trial and due process of law. Because we conclude that there was no state law evidentiary error in admitting the evidence, and Morales has not shown how the evidence affected his constitutional rights to present his defense, we reject this claim. (See *People v. Abilez* (2007) 41 Cal.4th 472, 503 [ "general rule that the application of the ordinary rules of evidence under state law do not violate a criminal defendant's federal constitutional right to present a defense"; *People v. Boyette* (2002) 29 Cal.4th 381, 427 ["attempt[s] to inflate garden-variety evidentiary questions into constitutional ones [are] unpersuasive" because

24

" 'the "[a]pplication of the ordinary rules of evidence . . . does not impermissibly infringe on a defendant's right to present a defense" ' "].)

C.  *Admission of Gutsu's Statement to Officer Paniagua*

    1.  <u>Background</u>

When Officer Paniagua attempted to conduct a traffic stop of Gutsu and Morales after they fled the Windsor robbery and shooting, Gutsu shot at Paniagua, Paniagua ran his patrol car into Gutsu and the Suburban, and Morales ran from the scene.  Paniagua eventually handcuffed Gutsu, and after being placed in a patrol car, Gutsu made various statements that were recorded by Paniagua's body camera.

The prosecution filed a motion in limine seeking to introduce evidence of Gutsu's statements to Paniagua in Morales's case.[18]  Morales opposed the motion, arguing Gutsu's statements were irrelevant, inadmissible hearsay not subject to an exception, testimonial (and therefore in violation of the Confrontation Clause), and unreliable.  As to Gutsu's statement that Morales "had an AK, but it's in the back," he argued the evidence should be excluded under section 352, asserting "no limiting instruction will be sufficient to cure the harm of the jury hearing that finger pointing from a non-testifying codefendant."

The trial court ruled Gutsu's statements were admissible as a declaration against interest under section 1230.  Specifically as to the statements about the AK-47, the court found that, "[v]iewed in context, the court believes that Gutsu's statement that 'He had an AK' is a statement against Gustu's penal interest and was not intended to be a self-serving statement shifting blame to Morales."

---

[18] Recall that Morales and Gutsu were tried together but with separate juries.

25

On appeal, Morales concedes that Gutsu's statement about the AK-47 is nontestimonial, but argues it was not admissible as a statement against interest. It is therefore in a much narrower framework that we consider whether it was error to admit Gutsu's single statement to Officer Paniagua.

2. <u>Analysis</u>

Although hearsay evidence (that is, "evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated") is generally inadmissible (§ 1200, subd. (a)), there are numerous exceptions to this rule. (*People v. Grimes* (2016) 1 Cal.5th 698, 710 (*Grimes*)). Section 1230 provides such an exception for declarations against penal interest.[19] This exception requires a showing "that the declarant is unavailable, that the declaration was against the declarant's penal interest when made and that the declaration was sufficiently reliable to warrant admission despite its hearsay character." (*People v. Duarte* (2000) 24 Cal.4th 603, 610-611.)

Section 1230 does not apply to "any statement or portion of a statement not itself specifically disserving to the interests of the declarant." (*People v. Leach* (1975) 15 Cal.3d 419, 441.) Thus, a declarant's confession that is self-serving or appears to shift responsibility to other is not admissible under

_____

[19] Section 1230 provides, "Evidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, was so far contrary to the declarant's pecuniary or proprietary interest, or so far subjected him to the risk of civil or criminal liability, or so far tended to render invalid a claim by him against another, or created such a risk of making him an object of hatred, ridicule, or social disgrace in the community, that a reasonable man in his position would not have made the statement unless he believed it to be true." Although section 1230 also applies to many different types of statements against interest, we are concerned in this appeal only with statements against penal interest.

section 1230.  (*Grimes*, *supra*, 1 Cal.5th at p. 715.)  Whether a statement is, in fact, disserving to the interests of the declarant depends on the context in which it was made.  A "hearsay statement that is facially inculpatory of the declarant may, when considered in context, also be exculpatory or have a net exculpatory effect" when made in an attempt to shift blame or curry favor.  (*People v. Duarte*, *supra*, 24 Cal.4th at pp. 611-612.)  On the other hand, " '[e]ven statements that are on their face neutral may actually be against the declarant's interest. . . .  The question . . . is always whether the statement was sufficiently against the declarant's penal interest "that a reasonable person in the declarant's position would not have made the statement unless believing it to be true," and this question can only be answered in light of all the surrounding circumstances.' " (*People v. Cortez* (2016) 63 Cal.4th 101, 127, quoting *Williamson v. United States* (1994) 512 U.S. 594, 603-604.)

We review a trial court's determination of admissibility under section 1230 for abuse of discretion.  (*Grimes*, *supra*, 1 Cal.5th 698 at p. 711.)

Here, Gutsu was apprehended in a vehicle matching the description of a vehicle associated with a just-reported nearby robbery and shooting.  Gutsu was armed with a semi-automatic pistol, which he had just used to fire at Paniagua.  As we have described, this was a rapidly developing situation in which Paniagua asked Gutsu whether he or his passenger were armed or had other firearms nearby.  Gutsu's response that his companion "had an A-K, but it's in the back" was against his penal interest because it demonstrated he knew Morales had a weapon (the AK-47), which was used in the Windsor robbery.  By this statement, Gutsu implicated himself in that robbery.  (See *People v. Cortez*, *supra*, 63 Cal.4th at p. 126 [codefendant's out-of-court statements that the defendant drove the car during a drive-by shooting were admissible because they served to implicate the codefendant in the crime];

27

*People v. Cervantes* (2004) 118 Cal.App.4th 162, 176 [statements that the defendant shot a man was against the declarant's interest because it showed that declarant was acting "in concert" with the shooter].)

Indeed, Morales acknowledges on appeal that Gutsu's statement "inferentially implicated Gutsu in the robbery." He argues, however, the primary purpose of the statement was to shift responsibility away from himself and onto Morales. But a statement against interest is not made inadmissible solely because it also implicates another person. (*People v. Almeda* (2018) 19 Cal.App.5th 346, 364 ["statements by a nontestifying codefendant that implicate the defendant, even by name, may be admissible if they are disserving to the codefendant's interest and are not exculpatory, self-serving, or collateral"].)

The trial court rejected Morales's argument, finding Gutsu's statement about the AK-47 "was not intended to be a self-serving statement shifting blame to Morales" when viewed in the context in which it was made. That context was an emergent situation during which Gutsu had little time to act upon, or even form, a self-interested motive. Gutsu had just been struck by the officer's patrol car and suffered what appeared to be a broken leg. He made the statement in response to Paniagua's question if he had any other weapons on his person (likely due to the fact that Gutsu had fired at him moments ago). Soon afterwards, he said to Paniagua, "It is what it is, bro. Live or die. You know what I mean."[20] Under these circumstances, the trial court reasonably could find Gutsu was not trying to shift blame when he said Morales had an assault rifle but it was now in the back of Gutsu's vehicle. (See *People v. Almeda*, *supra*, 19 Cal.App.5th at p.365 [statements by

---

[20] Gutsu volunteered this statement apparently in response to Paniagua apologizing for hitting him with his patrol car.

declarant in which they also admit to guilt are not "attempt[s] to shift blame"].)

In sum, it was within the trial court's discretion to find that Gutsu's statement that Morales had an AK-47 was against his penal interest given the specific facts of the case.

## DISPOSITION

The judgment is affirmed.

_____
Miller, J.

WE CONCUR:


_____
Richman, Acting P.J.


_____
Stewart, J.


A154263, *People v. Morales*